Tommie Patterson

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3

4

5    TOMMIE G. PATTERSON,
          Plaintiff,
6
     vs.
7
     JAMIE VANDERVER, ZACK SHOCK,
8    MONICA LIEBIG/WILLIAMS, CHRIS
     TAYLOR AND REGAL
9    ENTERTAINMENT,
          Defendants.
10   _____
     Case No. A06-0077CV (TMB)
11

12

13        VIDEOTAPED DEPOSITION OF TOMMIE G. PATTERSON,

14                   Pages 1-166, inclusive

15                  Commencing at 1:27 p.m.

16                  Friday, June 30, 2006

17                   Anchorage, Alaska

18

19

20              Alaska Stenotype Reporters
                   511 West Ninth Avenue
21              Anchorage, AK 99501-3520
                Serving Alaska Since 1953
22

23   Rick D. McWilliams, RPR, Ret.    Telephone 907.276.1680
     Fred M. Getty, RPR, Ret.         Email AkSteno@aol.com
24                                        Fax 907.276-8016

25

EXHIBIT A
Page 1 of 36

Tommie Patterson

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF ALASKA

 3

 4

 5    TOMMIE G. PATTERSON,
            Plaintiff,
 6
      vs.
 7
      JAMIE VANDERVER, ZACK SHOCK,
 8    MONICA LIEBIG/WILLIAMS, CHRIS
      TAYLOR AND REGAL
 9    ENTERTAINMENT,
            Defendants.
10    _____

      Case No. A06-0077CV (TMB)
11

12

13

14            VIDEOTAPED DEPOSITION OF TOMMIE G. PATTERSON,

15    taken on behalf of the defendants, pursuant to notice, at

16    the law offices of Jermain, Dunnagan & Owens, 3000 A

17    Street, Suite 300, Anchorage, Alaska, before Rosie S.

18    Scott, Certified Shorthand Reporter for Alaska Stenotype

19    Reporters and Notary Public for the State of Alaska.

20

21

22

23

24

25
```



EXHIBIT A
Page 2 of 36

Tommie Patterson

```
1    Anchorage, Alaska, Friday, June 30, 2006
2            VIDEOGRAPHER:  My name is Martha Enslow of
3    Media Impressions, P.O. Box 112081, Anchorage, Alaska.
4    I'm the videographer representing Alaska Stenotype
5    Reporters.  It is the 30th day of June, the year 2006.
6    We are on record at 1:27 p.m.  We're at the offices of
7    Jermain, Dunnagan and Owens, to take the deposition of
8    Tommie Patterson, in Case Number 306 CV 0077 (TMB),
9    Tommie Patterson versus Jamie Vanderver, et al.  This
10   deposition is being taken on behalf of the defendants.
11           At this time, if I could have everyone in the
12   room identify themselves verbally.
13           MR. SIMPSON:  Randall Simpson, attorney for the
14   defendants.
15           MR. PATTERSON:  Tommie Patterson.
16           MS. PATTERSON:  Marion Patterson.  Plaintiff's
17   wife.
18           VIDEOGRAPHER:  Are there any stipulations?
19           MR. SIMPSON:  No.
20           VIDEOGRAPHER:  Okay.  You may swear in the
21   witness.
22                   TOMMIE G. PATTERSON,
23   Called as a witness herein on behalf of the
24   Defendant, having been duly sworn upon oath
25   by Rosie S. Scott, Notary Public, was
```

EXHIBIT __A__
Page __3__ of __36__

Tommie Patterson

1    Q.    2004?

2    A.    2004.

3    Q.    And when you say a contract, you just -- you

4  hired on as the direct janitorial service for Fireweed?

5    A.    Yes, sir, I did.

6    Q.    And who did you enter that contract with?

7    A.    Mr. Zach Sheets.

8    Q.    Zach Sheets?

9    A.    Yeah.

10    Q.    And when you took that job, did you have a

11  business license?

12    A.    Yeah, I had a business.  I was in the process

13  of getting a business license.  He told me to go get me a

14  business license.

15    Q.    And when you say "he" that was Mr. Sheets that

16  told you?

17    A.    Yeah.  I was in the process of getting me a

18  business license.  The guy that had it, he was -- I -- we

19  couldn't keep up with him.  And I figured out well, why

20  work for him when I can -- you know, I'm doing it myself?

21  Why work for him when I'm doing the work myself.

22    Q.    You mean Mr. Waters at A-1 Custodial?

23    A.    Yeah, yeah.

24    Q.    So you decided you wanted to do it?

25    A.    Yeah.  Because if he did lost the contract,

EXHIBIT _A_

Page _4_ of _36_

Tommie Patterson

1   then somebody else could came in and took it over, and

2   I'd have been working for somebody else.  So I figured I

3   will -- why should I do that when I go, you know, buy my

4   own license and get the own business and work that

5   myself.

6       Q.    And what license name did you apply for?

7       A.    Hands On Custodial is the name of the company.

8       Q.    And was that a corporation, or an individual

9   proprietorship, or what kind of business license was it?

10      A.    It was, I think, a corporation.

11      Q.    Or was it you individually or --

12      A.    Individually business, individually business.

13      Q.    And that was Hands On?

14      A.    Hands On Custodial, yeah.

15      Q.    Do you still have that business license?

16      A.    Yes, I do.

17      Q.    So you kept it ever since?

18      A.    Yeah, I kept it.

19      Q.    And you applied for work as custodial at

20  Fireweed?

21      A.    Yes, I did.

22      Q.    As Hands On?

23      A.    Yes.

24      Q.    And did you also apply for custodial work at

25  other theaters?

EXHIBIT _A_
Page _5_ of _36_

Tommie Patterson

1    that you can point to as conduct by the named defendants

2    that you believe was discriminatory based on your race or

3    color?

4         A.    I'm going to say yes.  The reason why I'm going

5    to say yes is out of all the -- I mean -- I'm going to

6    say -- I'll call them memos.  Out of all them I put in,

7    ain't anybody took the time, or made a effort to answer

8    none of them.  They didn't answer none of them.

9         You know, it's like they didn't pay me any

10   attention.  And the job -- I'm going to say it don't

11   matter because they got rid of my company.  It don't

12   matter because I can get a job.  I'm not worried about

13   working, but the thing that got me about the whole

14   situation is if you going to let me go, do it in a manner

15   to make me know that, okay, we making a business move.

16   Okay.  That's good to know.

17        But when you ask me things such as I want you

18   to clean my session stand, clean my popcorn machine and

19   all that stuff because my other janitors did it, and I

20   want to charge you -- you charge me $300.  I'm not going

21   to do that.  I got enough work to do.

22        My other janitors did this and they did that.

23   I'm doing what I was told to do.  That wasn't part of the

24   contract for me to clean popcorn machines.  They got

25   ushers and stuff to do that back there -- session stand


EXHIBIT _A_
Page _6_ of _36_

Tommie Patterson

1     workers to do that.  You know, that's what I thought they

2     were doing, but she wanted me to do it for $300 a week.

3              Also she asked me -- I'm quoting her word for

4     word what she said.  She asked me that I should take a

5     cut in pay because what I make is cutting in on her

6     bonus.  Like, what my pay got to do with her bonus?

7         Q.    Okay.  And you're talking about -- this is

8     something -- these are things that Ms. Vanderver --

9         A.    Ms. Vanderver was doing, yeah.

10        Q.    This is not Mr. Sheets --

11        A.    Huh-uh.

12        Q.    -- or Mr. Taylor, it's Ms. Vanderver?

13        A.    Ms. Vanderver, yeah.

14        Q.    And she specifically said that other janitors

15    clean popcorn machines?

16        A.    Yeah, the ones in Washington.  She mentioned

17    Washington.  She mentioned Washington.  Yeah, she

18    mentioned Washington.  The ones down there clean her

19    popcorn machine and all that from behind the session

20    stand.  And she asked me why don't I take a cut in my

21    money because I'm cutting in on her bonus.

22        Q.    Okay.  Well, first --

23        A.    But I can understand.  You know, back then when

24    she said that she was going through something and, you

25    know, I shouldn't know this kind of stuff.  Just like she

Alaska Stenotype Reporters                53
Page 53

EXHIBIT _A_
Page _7_ of _36_

Tommie Patterson

1    Q.    Right.

2    A.    Because when I worked for A-1 he had me doing

3    it because he agreed -- I think he agreed that -- from

4    what Daryl told me, I just do it because it's look good

5    to go back there and do it, even though they be tracking

6    back and forth after -- before he leave out of there.  So

7    I went back there and mopped it too.  I did the same

8    thing because I was doing it for him when I took it over.

9    Q.    I'm going to ask you a couple of questions

10   about your crew.  How many crew did you have at Fireweed?

11   A.    Basically -- I'm going to say basically myself.

12   Q.    Basically yourself?

13   A.    Basically myself.

14   Q.    But there was this person that was a punk?

15   A.    I would get a guy come in and help me at night

16   then, especially when I get -- like when I get tired I

17   get somebody to come in and work the night with me.

18   Q.    So it was kind of sporadic?

19   A.    Yeah.

20   Q.    Not regular?

21   A.    Not regular.  Just come in and help me because

22   like I work seven days a week.  And say like I got to go

23   to work tonight, and say I worked real hard last night

24   because we had a big movie or something showing.  I'd say

25   well, it's going to be a big movie tonight.  I'd get

EXHIBIT  A
Page  8  of  36

Tommie Patterson

1    somebody go in and help me.

2        Q.    How about at Totem?  Did you have any help

3    there?

4        A.    Yeah, I had a guy that come in and help me.

5        Q.    One?

6        A.    One, yeah.

7        Q.    And was that regular?

8        A.    Every now and then.  Every now and then, yeah,

9    I had him come in and help me quite often, yeah, because

10   it --

11       Q.    More often than Fireweed?

12       A.    More often than Fireweed, yeah.

13       Q.    And what did you pay those guys?

14       A.    I gave them basically $10 a night, something

15   like that.

16       Q.    Flat fee?

17       A.    An hour, yeah.

18       Q.    About an hour or --

19       A.    About an hour.

20       Q.    About an hour of work so you'd give them $10?

21       A.    $10 an hour, yeah?

22       Q.    And did you have the same guys all the time

23   that you were --

24       A.    No, no, I had different people.

25       Q.    Different people.

EXHIBIT _A_

Page __9__ of __36__

Tommie Patterson

1    A.    So you got something like they call, what, a
2    day worker or something like that.  A guy that want to
3    make a couple of hours or make a few hours they would
4    come in and help you out.
5        Q.    Where do you find a day worker?
6        A.    Well, I knew -- I knew this guy and I knew his
7    sister.  And he would work with me a night or two and I
8    would get him to work with me a night or two.  You know,
9    she had another job she did.  She did something like tear
10   the inside of houses out so that people can remodel them.
11   She had a job like that.
12       Q.    And how did you know this guy and the sister?
13       A.    Oh, god, I know them through A-1.
14       Q.    Okay.
15       A.    Okay.  So Daryl had his sister working -- his
16   sister and her old man working with him, so I learned him
17   through --
18       Q.    So these are people that you would work with
19   when you went --
20       A.    I knew through cleaning A-1 -- with A-1, yeah.
21       Q.    How about the kid that was identified as a
22   punk, how did you find him?
23       A.    Well, his brother moved up here -- him and his
24   brother moved up here from Akron.  And they staying with
25   their sister.

58
EXHIBIT _A_
Page _10_ of _36_

Tommie Patterson

1             And I needed Sarah to go with me one night and

2      she sent Damian.  And so Damian and his brother wanted to

3      go.  So I let his brother come that night.  I let his

4      brother come.  He's a kid, and he basically, you know, he

5      just up here from her -- from Akron and like he said,

6      "Man, I want to get out of the house for a while."

7          Q.    How old was he?

8          A.    I think he's about 19 or something like that.

9          Q.    Young kid?

10         A.    Yeah.

11         Q.    And did you use him at the Totem at all, or

12     only at Totem?

13         A.    I used him at Totem that night, yeah.  Yeah, I

14     used him at Totem.  But after Ms. Vanderver said that,

15     the kid didn't come in.  That was a bad thing to say

16     about the kid, you know.  And I didn't appreciate that at

17     all.  And I told her -- I told him -- I told him what --

18     I told him.  I told him what she said.  And I didn't like

19     that.  I didn't feel good about that at all.  I told both

20     of them, I said, you know that was wrong for her to say

21     that.

22         Q.    How many total number of crew workers did you

23     have Mr. Patterson?

24         A.    Well, I just have this guy and his sister work

25     we me every now and then.

Tommie Patterson

1     Q.    And the boy?

2     A.    No, he just worked with me that one time.

3     Q.    Okay.  So mainly the brother and sister?

4     A.    Brother and sister, they helped me out.

5     Q.    And nobody else?

6     A.    Nobody else, no.

7     Q.    And who were they?  What was their names?

8     A.    One was named Damian.

9           THE WITNESS:  What's Damian's last name?

10    BY MR. SIMPSON:

11    Q.    Well, she can't help you.

12    A.    Damian.  I forget Damian's last name, but I

13    know her name -- the sister's named Sarah Williams.

14    Q.    Sarah Willins?

15    A.    Williams, Williams.

16    Q.    Williams?

17    A.    Yeah, Williams.

18    Q.    If you think of Damian's name just let me know

19    later.

20    A.    All right.

21    Q.    And both of them you paid about $10 a night?

22    A.    Yeah, about 10 or $8 a night or something like

23    that.

24    Q.    And would you pay social security on them, too,

25    or pay anything on --

EXHIBIT A
Page 12 of 36

Tommie Patterson

1      A.    Well, you know, they was like -- I'm going to
2    say day labor, and they didn't work all the time.
3      Q.    So you didn't file anything with federal
4    withholding or social security or anything like that?
5      A.    No, no, no, I didn't.
6      Q.    There's no payroll records?
7      A.    No, no.
8      Q.    It was all cash?
9      A.    All cash, yeah.  All cash.
10     Q.    And as far as your equipment for doing the
11   work, who provided the equipment?
12     A.    Well, Zach -- Mr. Sheets helped me -- in other
13   words, he gave me a good word.  He put in a good word for
14   me.  He took and let me went through him to get the
15   equipment, and I paid for it out of my -- through my
16   company.
17     Q.    Okay.  So Mr. Sheets helped you get equipment?
18     A.    Get equipment, yeah.
19     Q.    Do you know where he got it?
20     A.    Where we got the equipment from?
21     Q.    Where did he get the equipment?
22     A.    I got the equipment.
23     Q.    Oh, I see.  And then Mr. Sheets paid for it?
24     A.    He paid for it and I paid him.
25     Q.    And you paid him back?

EXHIBIT  A
Page 13 of 36

Tommie Patterson

1    Good Lord.  I can't recall his name.  I didn't do it out
2    of the janitorial.  I did it out of maintenance.  What I
3    made out of maintenance I would take and put in what he
4    owed me, and I would put in there payment for whatever
5    equipment I was paying on.
6        Q.    I see.
7        A.    And I would let him take that for the
8    equipment.  Just don't send me a check for that.
9        Q.    So he would deduct that and then pay you the
10   difference?
11       A.    Yeah.  What I would do is put that invoice in
12   saying this invoice is for the vacuum cleaner.  And what
13   would happen is they just wouldn't cut me a check for
14   that invoice because all that went to the vacuum.  But it
15   would show on my tax later on that I paid for it.  That's
16   the way we did it.
17       Q.    And under the contract when were you supposed
18   to come to work at Totem to do janitorial?  Was there a
19   set time?
20       A.    No, no, there wasn't a set time.  I could go in
21   there at 12:00 or I could go in there at 11:00.  I
22   generally go to Fireweed about 10 or 10:30.  I go in
23   there and get started.
24       Q.    And that's at night?
25       A.    At night, yes.

Tommie Patterson

```
1     Q     So it would be the end of the theater?

2     A     End of the theater time, yeah.

3     Q.    And you'd decide what time to go in?

4     A.    Yeah.

5     Q.    But sometime in the 10:30, 11:00 mark?

6     A.    Yeah.

7     Q.    And then about how long would you work there

8  then?

9     A.    It would take me -- I could do Fireweed in

10  about, what, three or four hours by myself.  I could do

11  it in three or four hours by myself.

12    Q.    How would you do Fireweed and then Totem?

13    A.    You know, if -- I did it for three years.  If

14  you're doing something -- and I'm going to put it like

15  this:  If you're doing something and you know how to do

16  it, and you done did it so long, it come easy.  You know,

17  you got a blower and you got a cord to that blower.  And

18  the hardest thing to cleaning that theater is getting

19  that cord around -- you got bolts down at the bottom --

20  is getting the cord around the bolts.  Everything else is

21  so easy.  It's really easy to clean.

22    Q.    So would you start at Fireweed and then go to

23  Totem?

24    A.    Go to Totem.

25    Q.    And how long at Fireweed would it take?
```

EXHIBIT  A
Page 15 of 36

Tommie Patterson

1      A.    It would take me -- I'm going to say it would
2    take -- according to what's planned, what the movies is,
3    and how busy it is, I'm going to say mostly it would take
4    me four hours at Fireweed.  And I'm going to say about
5    three, sometimes four hours at Totem.
6      Q.    So you'd start at 10:30, 11:00 and then end at
7    4 a.m. in the morning?
8      A.    About -- yeah, about 4:00, 5:00, 6:00 in the
9    morning.
10     Q.    5:00 or 6:00 in the morning?
11     A.    5:00 or 6:00 in the morning.  Sometimes I go to
12   about 10 o'clock during the way when I'm by myself.  But
13   I have went in there and cleaned.  I clean them both --
14   I've cleaned both of them by myself.
15     Q.    That's when you didn't have a crew to help,
16   right?
17     A.    Yeah, yeah, when I had nobody else.
18     Q.    Back to the complaint.  The other thing you
19   checked here are discriminated -- "defendant's conduct is
20   discriminatory based on my sex and my national orgin."
21   Do you see that?
22     A.    Uh-huh.
23     Q.    When you say national orgin, do you mean the
24   same thing as African American, or is there some other --
25   national -- let me ask, national orgin sometimes means,

EXHIBIT _A_
Page _16_ of _36_

Tommie Patterson

1      Q.   Okay.  Mr. Patterson, I've copied the documents

2   that you've brought here this afternoon, and I have

3   questions about some of them.  Okay?

4      A.   Okay.

5           MR. SIMPSON:  Why don't you mark this one

6   first.

7           (Exhibit 2 marked.)

8   BY MR. SIMPSON:

9      Q.   Okay.  Mr. Patterson, this is Exhibit 2.  And

10   it's the letter to you from the Mayor's Office of Equal

11   Opportunity.  Do you see that?

12      A.   Uh-huh, yeah.

13      Q.   And just to reference your complaint, the next

14   page, that's Exhibit 1 here.  There's a reference to

15   talking to Mr. Alex -- John Alexander.

16      A.   Right.

17      Q.   Is that the same incident?

18      A.   Yeah.  I got -- as a matter of fact, I got two

19   of these.  I talked to him one day and he gave me one and

20   I took it to the clerk of the court.  She asked me -- she

21   didn't think that was going to be sufficient enough.  So

22   I called him back and he told me that he would write me

23   another letter because he didn't -- they didn't do that

24   kind of stuff.  They didn't help people and stuff like

25   that.  They didn't -- it wasn't on them to do that.  So

EXHIBIT _A_

Page _17_ of _36_

Tommie Patterson

1    he wrote me this other letter, and I turned it to the
2    court, and I think this what --
3        Q.    And that's what you got from Mr. Alexander?
4        A.    Yeah, yeah.
5        Q.    And it says in your complaint that you filed
6    charges with the Equal Employment Opportunity Commission
7    on 4-7-06, do you see that?
8        A.    Yeah, yeah.
9        Q.    Paragraph F.  Is that what you filed with the
10   Mayor's Office of Equal Opportunity, John Alexander?
11       A.    No.
12       Q.    That's what you're referring to?
13       A.    I'm referring to that and I got another letter
14   over there, too, I think from the Human Rights
15   Commission.  I think it's from the Human Rights
16   Commission.
17            MR. SIMPSON:  Okay.  Well, let's mark that one
18   then, too.
19            THE WITNESS:  That's the Human Rights
20   Commission.  So, you know, after the -- they said that I
21   had to get all this stuff, I was making sure that I cover
22   all ground, and make sure that I went to the necessary
23   organization that they say I was supposed to go to.  I
24   went to both.
25            MR. SIMPSON:  Okay.  Let's mark -- let's mark

EXHIBIT _A_

Page _18_ of _36_

Tommie Patterson

1    this one Exhibit 3.

2              (Exhibit 3 marked.)

3    BY MR. SIMPSON:

4        Q.   Exhibit 3 is a letter from Mr. Alexander and --

5        A.   Yeah.

6        Q.   And Exhibit 2 is from Ms. Erin Collins?

7        A.   Yeah.

8        Q.   Is that correct?

9        A.   Yeah.

10       Q.   So you went both to the --

11       A.   Went to both, the Human Rights Commission and

12   the --

13       Q.   The mayor of Anchorage?

14       A.   Yeah.

15       Q.   And which one -- in your complaint where it

16   references you went to and filed a complaint April 7,

17   2006, which one of those is that referring to?

18       A.   I think it was this one right here.

19       Q.   The Human Rights Commission?

20       A.   Right.

21       Q.   Exhibit 2?

22       A.   I think Exhibit 2, yeah.

23       Q.   Okay.

24       A.   Because they told me I couldn't file because

25   they didn't -- they didn't handle that, but this is the

EXHIBIT _A_

Page _19_ of _36_

Tommie Patterson

1    letter that they gave me.  And this is what the court
2    said this is what was sufficient enough to cover whatever
3    I needed.
4        Q.    Okay.  So Exhibit 2 is dated April 13, 2006,
5    right?
6        A.    Right.
7        Q.    So was that the one that was filed on April 7,
8    2006 and then you got a response April 13th?
9        A.    Right, right.
10        Q.    And then you then went to John Alexander after
11    that?
12        A.    Yeah.  And he gave -- I think he gave me two of
13    them, didn't he?  He gave me this one and he gave me
14    another one.  Is that the second one you got in there or
15    both of them the same?
16        Q.    All I've got from the packet is the one from
17    the State Human Rights Commission, and the Municipality
18    of Anchorage dated May 10th.  You think Mr. Alexander
19    sent you another letter, too?
20        A.    I think he did.
21        Q.    Well, if you can find it.
22        A.    The court -- I think the court has them, but I
23    got a copy at the house.
24        Q.    But it was from Mr. Alexander?
25        A.    From Mr. Alexander, yeah.

EXHIBIT  A
Page 20 of 36

Tommie Patterson

1        Q.    And then one from Ms. Collins of the State
2    Human Rights Commission?
3        A.    Yeah.  That's the only one I got from her.
4    But I got two from him.  I'm pretty sure of that.
5        Q.    Okay.  Did you ever file -- in your complaint
6    it said, "Mr. Alexander at EEOC said they couldn't help
7    me.  Do you see that?
8        A.    Right.
9        Q.    That's Mr. Alexander from the Major's Office of
10   Equal Opportunity?
11       A.    Right, right.
12       Q.    Did you ever file with the federal agency --
13   the federal government Equal Employment Opportunity
14   Office?
15       A.    No, because the court said I didn't need that.
16   They said this is what I had to file.
17       Q.    I don't care what the court said, but did you
18   ever file with the federal government --
19       A.    No, I didn't.
20       Q.    You never did?
21       A.    No, I didn't.
22       Q.    And who at the court told you that this is what
23   you needed to file?
24       A.    The clerk of the court.
25       Q.    Clerk of the court told you that?

EXHIBIT _A_
Page _21_ of _36_

Tommie Patterson

1       A.    Right, right.

2       Q.    And this complaint you filed, what date?  April

3    10, 2006?

4       A.    Uh -- huh.

5       Q.    You signed that April 10, 2006?

6       A.    Yeah, yeah.

7       Q.    Correct?

8       A.    Right.

9       Q.    So that was before you'd gotten either the

10   letter --

11      A.    Right.

12      Q.    -- from Ms. Collins and the Human Rights

13   Commission and before you got a letter from Mr. John

14   Alexander?

15      A.    See, what we did is we went down to file it.

16   And she told us this is what we had to have.  So when she

17   told us that, I went down to Mr. Alexander.  I called him

18   and he told me he'd give me something.  He'll talk to his

19   attorney, talk to the attorneys upstairs.  He talked to

20   them.  They gave me this paper.  We took it to the

21   courthouse, and she said that was sufficient.  She didn't

22   think that was going to be sufficient enough because the

23   state needed something else.  Went back to Mr. Alexander,

24   and he said that -- he wrote me the other letter, then I

25   went to these peoples here.  And they told me -- Ms. Erin

Alaska Stenotype Reporters                100
        Page 100

EXHIBIT  A

Page 22 of 36

Tommie Patterson

1     told me what she couldn't do.  And I went to her office.

2     We filed a complaint with her then -- we filed a

3     complaint with her.  We filed a complaint with her.

4          Q.    Well, that's what I was trying to decide.

5          A.    Yeah, we filed a complaint with her.

6          Q.    With the Human Rights Commission?

7          A.    With the Human Rights Commission, yeah.

8          Q.    And is that one you filed on April 7th?

9          A.    Right.  She said that she couldn't -- that they

10    couldn't.

11         Q.    And then they sent you this letter April 13th?

12         A.    Right.  Right.  They said she couldn't.

13         Q.    So did you ever file a complaint with

14    Mr. Alexander's office?

15         A.    I called Mr. Alexander's office.

16         Q.    You just called him?

17         A.    I called him.

18         Q.    But as far as the complaint is saying we

19    filed -- or "I filed regarding discriminatory conduct on

20    April 7, 2006," that was the complaint you filed with the

21    Human Rights Commission, right?

22         A.    Right.

23         Q.    Okay.  And then you filed this complaint on

24    April 10th and the court told you you need something more

25    from the agency?

EXHIBIT _A_

Page _53_ of _36_

Tommie Patterson

1    A.    From him, yeah.

2    Q.    From Mr. --

3    A.    Alexander, yeah.

4    Q.    Okay.  So you went back to Mr. Alexander?

5    A.    And he gave me the other letter.

6    Q.    Did you ever go back to Ms. Collins at the

7  Human Rights Commission?

8    A.    Ms. Collins couldn't help me.  She said that

9  there ain't nothing they can do.  They don't handle that

10  kind.  They the state agency.  They only handle state

11  cases.  They don't handle the federal cases.

12    Q.    Did you actually talk to her?

13    A.    I talked to her, yes, I did.

14    Q.    After you got the April 13 letter?

15    A.    I talked to her before then.

16    Q.    Before April 13th?

17    A.    Before April 13th, I talked to her before then,

18  and I talked to her during the complaint -- see, when you

19  file a complaint, they talk to you and go through the

20  complaint with you.  They go through each allegation you

21  make and she talked to me and I talked to her, and then

22  she told me her finding.

23    Q.    Do you remember when you first talked to

24  Ms. Collins?

25    A.    No, I don't.



EXHIBIT _A_

Page _24_ of _36_

Tommie Patterson

1      A.    He talked -- I talked to him on the phone.  I
2    talked to -- he talked to his attorneys.  He got a group
3    of attorneys, he talked to the attorneys.  The attorneys
4    advised him what to do and that's what he did.
5      Q.    Right.  My question is did you ever file
6    anything in writing with the Municipality of Anchorage?
7      A.    No, I didn't.
8      Q.    Just with the Human Rights Commission?
9      A.    Just Human.
10      Q.    Do you have a copy of what you filed with the
11    Human Rights Commission?
12      A.    To the house, yes.
13      Q.    You do?
14      A.    I'll bring all that to you.
15      Q.    Okay.  Now these -- this is kind of the thing,
16    we just collect all of the paperwork.
17      A.    I'll bring it to you.
18      Q.    Now, in your complaint, that also says the EEOC
19    sent a notice of right to sue.  Do you see that in
20    Paragraph G?
21      A.    Uh-huh.
22      Q.    And then it says, which I received on such and
23    such date.  And you left that blank.  Did you ever
24    receive a -- what's called a notice of right to sue?
25      A.    If they can't help me and nothing they can do



EXHIBIT A
Page 25 of 36